Sosman, J.
Plaintiff Wood Waste of Boston, Inc. (“Wood Waste”) has brought the present action challenging the decision by the Everett Board of Health (the “Board”) denying its application for site assignment for a solid waste handling and processing facility. After filing of the administrative record, both parties moved for judgment on the pleadings. For the following reasons, plaintiffs motion for judgment on the pleadings is ALLOWED and the Board is ordered to grant plaintiff its requested site assignment in accordance with G.L.c. Ill, § 150A.
Procedural Background
Wood Waste presently owns and operates a solid waste handling facility located on Boston Street in Everett. Wood Waste bought the facility from the prior operator, who had never obtained the requisite approvals and permits for such an operation on the site.[1] The facility handles construction and demolition wastes, separating them into various components, processing them, and then sending them on to other locations. It does not dispose of the waste on site, but rather functions as a transfer station. The site in its present configuration conducts these operations outdoors. Wood Waste proposes to construct a series of buildings for processing and temporary storage of these wastes, but does not intend to expand either the *426 types of wastes handled at the facility or the volume of wastes handled. Rather, Wood Waste proposes to upgrade the operation, bring it into compliance, and obtain the various approvals and permits that the prior owner had never acquired.
In November 1993, Wood Waste applied to the Department of Environmental Protection (“DEP”) for a determination of site suitability pursuant to G.L.c. Ill, §150A. Prior to consideration of that application, Wood Waste was required to submit and obtain approval of an environmental impact report. After going through the required stages of that reporting process (Draft Environmental Impact Report, Supplemental Draft Environmental Impact Report, and Final Environmental Impact Report), the Secretary of Environmental Affairs issued her approval of the Final Report on July 14, 1995.
DEP then proceeded with its assessment of site suitability pursuant to G.L.c. Ill, §150A. On November 13, 1995, DEP issued its report finding that the project met the various criteria by which site suitability was to be determined.
Simultaneously, DEP had been negotiating with Wood Waste an agreed Administrative Consent Order to deal with the ongoing operations at the facility pending the outcome of the various applications and permitting procedures that needed to be completed to bring the facility into full compliance. That Administrative Consent Order was signed by DEP and Wood Waste on November 27, 1995. The Administrative Consent Order required Wood Waste to pursue the various regulatory approval procedures that needed to be completed and set time frames in which those steps were to be completed. In the interim, Wood Waste was ordered to comply with certain remedial measures and restrictions, including temporary measures to reduce dust from the outdoor operations and limitations on the volume of materials that could be stored on site.
Having obtained the required favorable report from DEP on site assignment, and as required by the Administrative Consent Order, Wood Waste then proceeded with its site assignment application to the Board pursuant to G.L.c. Ill, §150A. After public hearing in February and March 1996, the Board voted to deny the application, citing deficiencies in five of the statutory and regulatory siting criteria. The present appeal followed.
Statutory and Regulatory Background
Prior to 1987, G.L.c. Ill, §150A provided that no place could be operated as a solid waste facility unless the site had first been “assigned by the board of health of such city or town as a site for a facility.” Site assignments could be made subject to such conditions “as may be necessary to protect the public health, comfort and convenience.” Beyond this general standard of protection of “public health, comfort and convenience,” the statute did not set any specific criteria by which site assignments were to be evaluated.
When a board of health was considering an application for site assignment, it could obtain the advice of the Department of Environmental Quality Engineering (the predecessor to DEP) “upon request.” Otherwise, DEP played no role in the “site assignment” stage of a project. After a board of health approved site assignment, the facility could not be “constructed or operated unless the proposed use and the plans or design therefor have been approved by [DEP].” Thus, after site assignment by local authorities, DEP would have responsibility for reviewing and approving the plans, designs and operation of the proposed facility.
In 1987, the Legislature drastically rewrote §150A, added a new list of specific criteria for site assignments in §150Al/2, and provided for further regulation of solid waste facilities and financial support to public bodies in a newly enacted G.L.c. 21H, §1 et seq. St. 1987, c. 584, §§3, 16, 17. In doing so, the Legislature recognized that there was “a critical need to eliminate, mitigate and prevent the nuisances and adverse public health effects associated with the collection, processing and disposal of solid waste” and that “[tjhere is pending throughout the commonwealth a severe shortage in environmentally safe and financially sound capacity for the storage, disposal and processing of solid waste.” G.L.c. 21H, § 1 (a)(1) and (2).
The amended version of §150A significantly changed the respective roles of DEP and local boards of health. As amended, §150A now provides that site assignment for a solid waste facility may not be granted unless DEP determines that it meets the specific criteria set out in §150A1 /2. Thus, DEP is no longer in the mere advisory role available to local boards of health “upon request” in the site assignment process but is instead a necessary step that the applicant must pass. If an applicant does get the necessary favorable report from DEP, the applicant must still get the actual site assignment from the local board of health.
With regard to the role of the board of health in granting or denying that site assignment, §150A now provides that the board “shall assign” a site as requested “unless it makes a finding, based on the siting criteria established by [§150Al/2], that the siting thereof would constitute a danger to the public health or safety or the environment.” DEP’s regulations repeat that requirement:
A board shall determine that a site is suitable for assignment as a site for a new or expanded solid waste facility unless it makes a finding, supported by the record of the hearing, that the siting thereof would constitute a danger to the public health, safety or environment, based on the siting criteria set forth and established under 310 C.M.R. 16.40.
310 C.M.R. 16.20(10)(k)(2).
Thus, once an applicant has satisfied DEP that the requisite siting criteria have been met, a local board of health can not withhold the site assignment unless *427 it makes an affirmative finding that a solid waste facility at the site would constitute a danger to public health or safety, or a danger to the environment, of the type encompassed within the criteria of §150Al/2. In the absence of such an affirmative finding, or if there is not substantial evidence to support such an affirmative finding, a board’s denial of site assignment is beyond its authority under §150A.[2]
Wood Waste argues that the statute now makes DEP’s approval of a project “prima facie evidence" that the project meets the siting criteria, or that it creates a “presumption” that the site is appropriate that must be “rebutted” in order to deny the application. The statute does not use such terminology, and the concepts of “prima facie evidence” and “rebuttable presumption” are not precisely identical to what §150A now provides. Under §150A a board of health may disagree with DEP, and nothing in the statute confers any particular weight to DEP’s decision or requires a board to have evidence above and beyond what was submitted to DEP in order to deny site assignment. However, a local board of health must make an actual finding that the facility “would constitute a danger” in order to deny the application. As will be discussed below in the context of each deficiency cited by the Board, a board’s view that it needs more information to determine whether or not there would be a “danger” is not a “finding” that the siting “would constitute a danger” and is thus not a basis on which an application may be denied.
Under §150Al/2, DEP and the Department of Public Health were to promulgate regulations setting standards and criteria for site assignment determinations. Those criteria include the site’s relationship to residential areas and to water, the potential impact on air quality, the available access roads and potential traffic impacts, the potential impact on wildlife and agriculture, the potential for creation of a nuisance (from “noise, windblown litter, or the proliferation of rodents, flies or other vermin”), and “the potential for the adverse public health and safety impacts.” In addition, the criteria provide that preference is to be given to projects in municipalities without existing facilities and that are not part of a regional disposal district. DEP’s regulations have amplified these criteria and set some detailed specifications for site assignments. 310 C.M.R. 16.00 etseq.
DEP’s site assignment regulations have also imposed certain presumptions and prevented boards of health from considering certain technical matters that have been or will be addressed by DEP itself as part of later permitting reviews for the facility. Specifically, boards must presume that the facility “shall be designed and constructed to meet all relevant state and federal statutory, regulatory and policy requirements.” 310 C.M.R. 16.40(l)(c). Boards may not “impose any conditions pertaining to facility design” except in accordance with conditions imposed by DEP itself, and the review is not to entail consideration of design and operational details unless DEP determines that those specifics “are necessary to determine whether potential discharges or emissions from the proposed facility could render the site not suitable and requires the applicant to submit such relevant and detailed information.” 310 C.M.R. 16.40(l)(b) and (c). In substance, these limitations prevent a local board from second-guessing or interfering with DEP’s consideration of the technical environmental issues involved. After a site has received site assignment, the facility still needs both a construction permit and a permit to operate from DEP (see 310 C.M.R. 19.00 et seq.). Specific design issues and operational details are considered as part of those later permit applications and, absent some concern voiced by DEP, such technical details do not have to be addressed by the applicant at the site assignment stage. Thus, aboard of health may not deny site assignment over issues pertaining to design and construction specifics or operational details unless DEP itself is of the view that the siting criteria for a particular application are dependent on those details.
A person aggrieved by a board’s site assignment decision may appeal that decision pursuant to G.L.c. 30A, §14, as §150A expressly provides that a local board of health is to be deemed a “state agency” for purposes of appellate review.
Analysis of the Board’s Findings
In its present appeal, Wood Waste contends that the Board’s decision denying its site assignment application lacks the requisite affirmative findings of any danger to public health, safety or the environment and/or that its assessment of same improperly considered items that, by statute and regulation, are left up to DEP. As such, Wood Waste contends that the Board committed errors of law and exceeded its authority. Wood Waste further argues that the Board’s factual findings, such as they are, are not supported by substantial evidence. Each of these arguments will be considered in the context of the specific defects that the Board cited in support of its decision.
1. Groundwater elevation
The Board decided that Wood Waste’s application failed to meet the criterion pertaining to separation from groundwater. The statutory criteria provide for consideration of “the relationship of the site to groundwater elevations,” §150Al/2(2), and DEP has set a requirement that a site is not suitable if “the maximum high groundwater table would be within two feet of the ground surface areas where waste handling is to occur,” 310 C.M.R. 16.40(3)(d)(5).
DEP was satisfied that Wood Waste had met this requirement based on the fact that, during placement of telephone poles to a depth of ten feet for fencing, no ground water had been observed. The Board criticized DEP’s assessment on several grounds. It noted that *428 this finding was not based on actual groundwater sampling, that the observations were not supervised by a “registered professional engineer” as required by 310 C.M.R. 16.08(5)(b), that the observations pertained to the site perimeter where the fencing was being installed and not to the precise area where the waste would be handled, and that the timing of these observations was unclear (and thus not necessarily made during a time of maximum groundwater elevation). The Board also noted that Wood Waste had, in its environmental impact report, inconsistently listed the groundwater separation as four to six feet. Finally, the Board referenced the fact that there were “springs,” “creeks” and/or a “river” running through the area until it was filled (which had occurred some fifty years earlier). Based on these concerns, the Board concluded that “a properly conducted groundwater elevation study, prepared by a registered professional engineer and pertaining to the area of the proposed waste handling, is required to ensure compliance with the site suitability criteria concerning a two foot separation between the ground surface and the maximum high groundwater table.” In the absence of such a study, the Board concluded that the site “cannot be determined to be suitable.”
The Board’s criticisms of the information provided on the subject of groundwater elevation, however valid they may be, do not support an affirmative “finding” that the project “would constitute a danger to the public health or safety or the environment” as required by §150A. The Board can not deny site assignment simply by saying that it needs more information. To deny the application on this criterion, the Board must make a finding that the site violates the criterion itself, not simply that it would like to see a better study addressing the criterion.
The record contains no evidence that the site actually fails to meet this criterion — i.e., there is no evidence suggesting that the separation between the surface areas where waste will be handled and the maximum groundwater elevation is less than two feet. The fact that, prior to filling a half centuiy earlier, there was water on some of the surface areas of the site does not suggest that the filling is so shallow as to have the surface within two feet of groundwater. The only evidence of groundwater levels in this record is that (1) groundwater is approximately four to six feet below the surface (a separation that more than satisfies the requirement of a two-foot separation) and (2) at the perimeter on at least one occasion, groundwater elevation was separated from the surface by more than ten feet. In the absence of any finding that the actual groundwater separation is such that the facility would endanger public health, safety or the environment, and in the absence of any evidence to support such a finding, the Board committed error when it denied the application on account of alleged failure to satisfy §150Al/2(2) and 310 C.M.R. 16.40(3)(d)(5).
2. Traffic impacts
The criteria for siting of solid waste facilities include “the availability and suitability of access roads to the site” and “the potential impact of increased traffic volume on roads to the site.” §150Al/2(7) and (14). The regulations provide that a site is not suitable if “traffic impacts from the facility operation would constitute a danger to the public health, safety, or the environment” based on considerations including traffic congestion, pedestrian and vehicular safety, and road configurations. 310 C.M.R. 16.40(4)(b).
DEP was satisfied that the site met the criteria relating to traffic and access. DEP noted that the site was located off of Revere Beach Parkway (Route 16), which would provide access to the site on Boston Street. DEP’s finding also incorporated by reference the traffic analysis in Wood Waste’s environmental impact reports, concluding that “traffic is not expected to pose adverse impact upon the area.”
Where the facility for which Wood Waste sought site assignment was already in existence and operational, Wood Waste’s environmental impact reports contained information from actual operational experience, not projections of traffic volumes for a yet to be constructed facility. The Wood Waste application involved an upgrading of the site, but no expansion or alteration in the volumes or types of wastes that would be handled. As such, experience from Wood Waste’s actual operations would be the most reliable way to assess any health or safety problems stemming from traffic impacts.
The actual daily volume at Wood Waste ranged from a low of eleven vehicles to a high of forty-five vehicles entering and exiting the facility. The maximum number of vehicles in any one hour period was nine. Where Route 16 carried something on the order of 40,000 vehicles per day (a figure already including the vehicles going to and from Wood Waste), the Wood Waste operation had a de minimis impact on Route 16 traffic.[3] Moreover, the Wood Waste facility closes at 4:00 p.m., meaning that none of the vehicles going to and from Wood Waste are on those access routes at the evening rush hour. During the morning rush hour, a maximum of four vehicles had come to the site. Inasmuch as the vehicles westbound on Route 16 had a designated left turn lane onto Boston Street, those few vehicles would not be contributing to rush hour congestion.
The Board rejected the figures stemming from actual experience at the site and instead made a series of calculations based on tonnage and size to project an average of fifty or more vehicles per day going in and out of the site. The Board then hypothesized that the turning radius of those trucks would cause problems at the intersection with Route 16. Finally, the Board criticized Wood Waste for not conducting “a comprehensive traffic analysis” or “an engineering traffic study,” and therefore concluded that Wood *429 Waste’s presentation on the issue of traffic was ‘inadequate to satisfy the traffic and access criteria."[4]
Absent from the Board’s decision is any specific finding that the traffic to and from the facility would cause a danger to public health or safety. Again, mere criticism of Wood Waste’s presentation as not being sufficiently in-depth does not equate to the affirmative finding of a danger to public health or safety that must be made in order to reject an application for site assignment. The Board’s discussion of the traffic issue expressly articulates the Board’s erroneous understanding of just what finding needed to be made: “Wood Waste did not provide credible evidence to support a finding by the Board that traffic impacts from the Facility would not pose a danger to public health or safety.” Under §150A, it is not up to Wood Waste to demonstrate that the facility “would not pose a danger.” Rather, the application must be approved unless the Board finds that the facility “would constitute a danger.” Rejecting Wood Waste’s application because it did not present evidence sufficient to support a finding that the Board was not supposed to make was an error of law.
Nor could this record support an affirmative finding that the traffic impacts from the facility’s operation would constitute a danger to public health or safety, as there is not substantial evidence to support any such finding. “Substantial evidence” is “such evidence as a reasonable mind might accept as adequate to support a conclusion.” G.L.c. 30A, §1(6). In determining whether there is “substantial evidence” to support a particular conclusion, the question is not merely whether the record contains isolated pieces of information that might support the conclusion. Rather, this court is to look at the record as a whole, including those things that would detract from the weight of the evidence in question. See Amone v. Commissioner of Dept, of Social Services, 43 Mass.App.Ct. 33, 34 (1997) and cases cited therein.
An engineering consultant who prepared a report for the Board provided more criticism of purported inadequacies in Wood Waste’s traffic analysis, but was unable to opine that there would actually be some danger to the public from this traffic. He expressed concern that “any turning movements” across Route 16 “could be a potential hazard” and that trucks turning in and out of the site on Boston Street would, because of their size, “swing into the opposite lane on the street.” When asked how much traffic was on Boston Street (i.e., how many other vehicles would be inconvenienced or endangered by this activity), he said he did not know. When asked about trucks making their turns on and off Route 16 at intersections with traffic signals, and whether in light of those available turning locations he could opine that there would be a danger to public health or safety, the consultant acknowledged that he was not able to render such an opinion. The Board did not have before it any expert opinion on which it could conclude that the traffic impacts from this facility would constitute a danger to public health or safety.
The Board inexplicably ignored the fact that current operations were not causing any perceptible traffic problems. Where the facility had already been in operation for some time, any actual health or safety problems stemming from these trucks coming and going, and turning on and off of Route 16, would have long since materialized and could easily have been shown. There was no evidence before the Board suggesting that the daily volume of trucks in and out of the facility had caused any such problems in the past or that they would do so in future. Even if the Board had some basis for its hypothetical projection of in excess of fifty vehicles per day at the facility, that projection does not automatically equate to a threat to health and safety. The Board’s consultant did not express such an opinion, and ultimately acknowledged that he did not have the information that would enable him to render such an opinion. The evidence of actual experience so detracts from the weight of these speculative hypothetical calculations that the record, taken as a whole, does not contain substantial evidence in support of any finding that the facility’s traffic impacts would constitute a danger to public health or safely.
As such, the Board committed an error of law when it denied Wood Waste’s application on account of “traffic impacts,” and the record does not contain substantial evidence on which a finding of adverse traffic impacts could be based.
3. Air quality
The statute provides that “the potential for adverse impact on air quality” is to be considered in determining site assignment. §150Al/2(9). DEP’s regulations provide that a site is not suitable if “the anticipated emissions from the facility would not meet required state and federal air quality standards or criteria” or if those emissions would constitute a danger in light of “(1) the concentration and dispersion of emissions; (2) the number and proximity of sensitive receptors; and (3) the attainment status of the area.” 310 C.M.R. 16.40(4) (e). DEP was satisfied that the Wood Waste project met this criterion. It further noted that the facility would have to be operated in accordance with both waste management regulations, 310 C.M.R. 19.00 et seq., and air pollution control regulations, 310 C.M.R. 7.00 et seq., and that compliance with those requirements would suffice to prevent any danger to public health, safety or the environment.[5]
As discussed in Wood Waste’s environmental impact reports, the principal air quality issue for this facility is dispersal of dust particles. In the past, the outdoor dumping and transferring of piles of construction debris have generated dust clouds that, depending on wind conditions, can travel to nearby areas. The facility upgrade proposed by Wood Waste involves *430 enclosing these operations inside a building. Dust inside the building would be reduced by use of water atomizer nozzles producing a fog-like spray. Ventilation fans would also be used to create a slight negative pressure inside the building and thereby prevent dust from escaping via the entrance bays.[6]
The Board again criticized Wood Waste for not presenting enough information on this issue, and again expressed the erroneous view that the burden was on Wood Waste to prove the absence of a danger: “Wood Waste’s Application failed to provide sufficient technical information to enable the Board to determine that the Facility would not constitute a danger to public health, safety or the environment.” The Board criticized Wood Waste for not submitting “an air modeling study incorporating particulate emissions, local atmospheric conditions and nearby sensitive receptors," which the Board characterized as “essential.” Wood Waste’s failure “to provide information defining the type, concentration and dispersion of likely emissions from the Facility . . . precludes the Board from determining that particulates would not constitute a danger to public health or safety or the environment.” As with the other criteria, the Board erred when it applied a standard requiring Wood Waste to prove that the facility would “not” pose a danger.
The Board did purport to make an actual finding on this criterion, opining that “emissions of particulate from the Site would constitute a danger to public health, safety or the environment even if the Facility complies with state and federal air quality standards.” The Board found that “in practical operation of the dust filters and exhaust fans on the processing building, unacceptable levels of particulates in excess of air quality regulations will likely be emitted from the Facility.” The Board went on to find that the proposed filters and fans were not “best available control technologies” as required by DEP’s air quality regulations.
While these findings at least state the correct standard to be applied (le., a finding that the project would constitute a danger, rather than a mere finding that Wood Waste has failed to prove the absence of a danger), there is no evidence in the record to support them. The consultant who analyzed the project for the Board criticized Wood Waste for not conducting a thorough enough analysis (a criticism that does not demonstrate a danger to public health, safety or the environment). He also expressed uncertainty as to whether the spray atomizers would “work continuously while the trommel screen and grinder are in operation, or only at specified intervals during the processing events,” recommending that the sprays be set to trigger whenever the particulates in the air exceeded a set level. He further recommended that dust control be achieved by addition of a bag house on the roof. Uncertainty as to how and when the sprays would be triggered, a recommendation as to what that trigger should be, and a stated preference for construction of a bag house do not support a finding that the sprays will not work well enough to keep dust emissions at or below safe levels. The consultant also opined that the proposed fan system would not negatively pressurize the building and that dust would therefore escape when the bay door opened. He gave no explanation as to why he thought the fans would not work, nor did he provide any indication as to how much dust would be emitted during times that the bay door was opened or any basis for believing that that amount of dust would constitute a “danger.”
The Board’s analysis, such as it was, also failed to accord Wood Waste the presumptions mandated by DEP regulations. The Board was required to presume that the facility would be designed and constructed in accordance with state and federal requirements, including various technical requirements on air quality control. 310 C.M.R. 16.40(l)(c)(l). The issue at this stage is the suitability of the site, not the issuance of all other forms of permits Wood Waste must ultimately acquire in order to construct and operate the enclosed facility (including its air quality permit from DEP pursuant to 310 C.M.R. 7.02 and its construction and operation permits). The details of design and operation Eire not to be part of the site assignment consideration unless DEP (not the Board on its own) decides that such details are necessary at the site assignment stage. 310 C.M.R. 16.40(l)(c).
Clearly, DEP did not think such details needed to be submitted for site assignment consideration of this particular application, deferring its consideration of those technical issues until the later air quality permit Eind construction permit review. At that stage, Wood Waste will need to submit in specific detail, and DEP will consider in detail, such things as exactly what measurements or timed events should signal a release from the mist nozzles, or precisely what fan system will be needed to prevent dust escaping through the bay doors, etc. Similarly, DEP (and not the Board) will assess whether the specific design complies with the technical requirements of “best available control technologies.” Where DEP is satisfied that the air quality concerns are not such as to make the site itself inappropriate, the engineering specifics of the design and construction are not to be further reviewed at the time of site assignment. Concerns about those yet to be reviewed technical specifics are not a basis for finding that siting the facility at that location will constitute a danger to public health, safety or the environment. The Board lacked a factual basis for such a finding, and its purported factual basis impermissibly trenched on DEP’s expertise and authority with respect to technical design issues.
4. Size of the facility
DEP’s regulations provide that a site is not to be assigned “if the size of the proposed site is insufficient to properly operate and maintain the proposed facility.” 310 C.M.R. 16.40(4) (g). In considering whether *431 the size of the site is or is not adequate, “the distance of the waste handling or disposal area from the property boundary shall be taken into account.” Id. DEP’s solid waste management regulations specify that the waste handling area is to be set back 100 feet from the property boundary. 310 C.M.R. 19.038(2)(b)(3).
DEP was satisfied that the 2.2 acre site was of adequate size for the facility’s operation. In making that determination, DEP noted that the facility would be enclosed. DEP did observe that the handling areas did not meet the 100-foot setback requirement and that the facility would therefore need a variance in order to get its operating permit, but deferred further consideration of the setback issue until that time, as the merits of any such request for variance would involve specific review of facility design- — ie., the need for the setback is a function of the design of the enclosed facility.
The Board found that the location of the weigh scale was too close to Boston Street such that trucks waiting their turn on the scale would “queue up" on Boston Street and thereby create a danger to public health and safety. The Board was not satisfied with Wood Waste’s proposal to install a sign directing trucks into the yard in the event that the scale was already occupied. The Board, and its consultant, assumed that drivers would not want to maneuver their vehicles inside the site and would therefore ignore these directions and line up at the entrance to the facility.
This finding of a safety hazard from trucks not having enough room between the street and the scale is not supported by substantial evidence. As set forth in Wood Waste’s environmental impact reports, the scale in question was installed in October 1994 and had dramatically expedited the processing of incoming trucks. Prior to that installation, Wood Waste employees had to determine the volume of each incoming load by visual inspection of the load and estimation of volume, making handwritten records as they went. With the scale, the vehicle simply drives onto the scale, the operator puts a ticket into the computer, and the scale measures the weight and records the data in the computer. The transaction on the scale takes about ten seconds.
When the maximum number of vehicles arriving at the site in one hour has been only nine, and with the actual scale weighing of a vehicle taking only ten seconds, one would not expect any “queue” to form on Boston Street. On the rare occasion (if ever) when two trucks arrived at the same time, the second truck would be required to pull in and wait briefly in the yard, and no “queue” would form unless that hypothetical second truck disobeyed that instruction. Even then, that “queue” would last for only the brief few moments that it would take to complete the weighing of the first truck.[7] Conspicuously absent from the Board’s findings, or from the Board’s consultant’s report, is any reference to an actual “queue” of trucks ever having formed on Boston Street since the installation of the weigh scale.[8] By comparison, the engineering consultant for Wood Waste, who had observed the site in operation for some time, testified that trucks were not encountering any difficulty getting onto the weigh scale.[9]
Speculation that multiple trucks could arrive at the same time, refuse to obey directions to pull into the yard, “queue up” on Boston Street, and thereby form a traffic hazard with the unspecified volume of traffic on Boston Street is not “substantial evidence” of a danger to public safety stemming from any inadequate size of the facility, and it is certainly not substantial when the record contains unrefuted evidence from actual operation of the facility that no such problem is occurring. The denial of site assignment due to any “queue” of trucks on Boston Street was not based on substantial evidence.
The Board, based on the analysis of its consultant, also found that there was insufficient space for the processing, separation and storage of different types of wastes on the site. This conclusion stemmed from hypothetical calculation of volumes and speculation as to minute operational details as to how certain wastes would be handled, how long they would remain, etc.[10] In large measure, the consultant was again merely complaining that Wood Waste needed to provide additional detailed information about its operations, even though DEP had not required any submission of detailed operational plans. See 310 C.M.R. 16.40(l)(c). For example, the consultant expressed concern that the application did not spell out the procedures for rejecting a particular load, did not provide “detail” for resale of wood chips and timbers or identify storage areas for same on the plan, and did not make clear the composition of each waste stream within the facility. Where DEP had not required that detail to be set forth, the absence of operational detail was not a defect in the application, and the absence of that detail certainly does not mean that the site is too small for a solid waste facility. Operational details will have to be supplied to and approved by DEP later on as part of Wood Waste’s application for a permit to operate the facility. Again, the Board’s analysis strayed into inappropriate consideration of details that are not encompassed in site assignment but that may become very important when Wood Waste applies for its actual permits from DEP.
There was no evidence that the current operation, which would be upgraded and enclosed but operating at the same volume under the new plan, had encountered size problems with its 2.2 acre site, and certainly no evidence that the size constraints would result in a danger to public health or safety.
5. Prior solid waste disposal at the site
The statute provides that consideration should be given to “whether areas adjacent to the proposed site have been previously used for solid waste disposal.” *432 §150Al/2(8). DEP’s regulations on the subject provide that, where an area has been used for solid waste disposal, consideration should be given to whether those prior disposal activities adversely impact or threaten the site and whether the new use of the site will adversely impact the areas previously used for disposal. 310 C.M.R. 16.40(4)(h).
Wood Waste argues that this criterion is inapplicable to its proposal as there has been np “disposal” of solid waste at the site within DEP’s definition of that term. The term “disposal” means “the final dumping, land filling or placement of solid waste into or on any land or water or the incineration of solid waste.” 310 C.M.R. 16.02. Wood Waste contends that the adjective “final” modifies all three of the activities then described (i.e., “final” dumping, “final” land filling or “final” •placement), and that the term “disposal” therefore does not refer to the mere temporary handling or storage of waste. In the context of assessing whether prior “disposal” at or near the site would make it inappropriate to place some other facility there, there is considerable logic supporting Wood Waste’s interpretation. If the area at or around the site was used for a final deposit of waste in the past, one would want to make sure that the new proposed site uses would not disturb or affect the integrity of the waste already there. However, where waste has merely passed through the site at some prior time, one is not faced with the problem of contamination from or disruption of that waste. The Wood Waste site has been used to sort wastes and send them on for “final” disposal elsewhere. The Wood Waste site is not and has not been the “final” resting place for the solid waste that has come through its facility. There is no cache or deposit of earlier waste that will be affected by current operations, as that earlier waste has long since gone.
On this criterion, DEP’s own ruling on the application is somewhat cryptic. It recites as follows:
Pursuant to information currently available to the Department, the site has been used for improper solid waste disposal by a previous operator. This site assignment is being sought as part of a commitment of the current operator to bring the site into compliance with requirements for siting and operating a solid waste management facility.
Thus, DEP was of the view that the prior activity at the site did constitute “disposal,” and, whatever the logic of Wood Waste’s argument, this court will defer to DEP’s interpretation of its own regulation on the subject. However, DEP was apparently satisfied that the present proposal to bring the site into compliance did not pose a problem or otherwise create any danger to public health, safety or the environment stemming from that prior “disposal.” The question is whether the prior uses, which did not involve any permanent placement of demolition and construction debris, will loe adversely affected by or will themselves adversely affect a properly sited and permitted transfer facility at the same location. DEP was satisfied that there would not be any such problem, and, absent evidence of some form of contamination from previous temporaiy storage of the materials on site, one would not expect such a problem.
The Board observed that wastes previously stored on the site had been exposed to the elements, thereby “increasing the possibility and danger that hazardous materials leached out of that waste and into the underlying, uncovered soil and groundwater.” That hypothetical release or threat of release “would necessitate assessment and corrective action” under DEP regulations, and “Wood Waste’s ability to assess and correct contamination and comply with DEP’s regulations would be adversely impacted by operations at the Facility.” The Board, as it had on other criteria, found against Wood Waste on this criterion because it felt Wood Waste should have provided more information on the issue:
In order to determine whether the prior unlawful solid waste disposal and the Facility might adversely impact each other, the Board concludes that Wood Waste should have conducted an assessment of the Site, including chemical sampling of the soil and groundwater for a wide range of hazardous materials, to determine whether there has been a release of hazardous materials at or from the Site. Wood Waste did not conduct or provide such an assessment. Absent credible evidence proving there has not been a release of hazardous materials at or from the Site resulting from past unlawful disposal, the Board concludes that the prior unlawful solid waste disposal threatens to adversely impact the proposed Site and Facility and the proposed Site .and Facility may adversely impact the area previously used for unlawful waste disposal.
This analysis is simply another example of the Board’s erroneous understanding of what had to be found in order to deny Wood Waste’s application for site assignment. If the information before the Board does not indicate whether there is or is not any hazard from prior storage of waste on the site, one can not make a finding that there is such a hazard. The Board was again requiring Wood Waste to prove the absence of any danger, whereas its application could only be denied upon an affirmative finding that there was a danger.
Obviously, the Board could have had its engineering consultant take some samples and see whether there were any “hazardous materials” that had leached into the soil or groundwater or otherwise seek to uncover some evidence of what the soil and groundwater conditions actually were. Rather, the Board’s consultant merely criticized Wood Waste’s failure to conduct more extensive testing.[11] He did not present any evidence of actual contamination, or any reason to believe that there was contamination that would now adversely impact or be adversely impacted by the *433 operation of the transfer station. In the absence of such evidence, the Board had no basis for concluding that the prior use of the site made the proposed upgraded use a danger to public health, safety or the environment.
Relief
Having concluded that the Board committed legal error, exceeded its authority, and made findings that are not supported by substantial evidence, the court may remedy these errors either by remanding the matter for further proceedings before the Board, by modifying the Board’s decision, or by compelling any action unlawfully withheld. G.L.c. 30A, §14(7). Under G.L.c. Ill, §150A, a board of health “shall assign” a site as requested by the applicant “unless” it makes certain findings. The question is whether, having failed to make the findings required to deny .site assignment (or having made findings that can not be supported on the record), the Board should be given a further opportunity to make such findings or whether this court should simply order that the site assignment be made. More specifically, where much of the error in the Board’s decision stemmed from its failure to understand that it needed to have affirmative evidence of danger to the public health or safely or the environment in order to deny this site assignment, the question is whether the Board should now be given the opportunity to find such evidence or whether the Board should be foreclosed from further investigation of this application.
If it appeared likely that substantial evidence could be marshaled in support of the Board’s decision, but that that evidence was not presented merely because the Board misunderstood the applicable standard, it might well be appropriate to remand the matter to the Board and give it the opportunity to correct that correctable error. However, from all that has been presented to this court, that does not appear to be the case. Numerous parties opposed this application and, during both the environmental impact report process and the site assignment process, came forward with the information they had to try and convince both DEP and the Board that this project should not be approved. Notwithstanding both the numbers of opponents to the project and the vehemence of their opposition, this record still lacks any affirmative evidence of harm to the public health, safety or the environment.
Moreover, DEP, the agency that did have the authority to assess whether Wood Waste had affirmatively satisfied the siting criteria, is satisfied that Wood Waste has done so. While DEP’s decision does not take away the Board’s authority to find that there is a danger to public health, safety or the environment, the fact that the agency with broad discretion to deny this application determined that the applicant had affirmatively satisfied all the criteria is strong indication that affirmative evidence of any danger from this project will be hard to find.
This court is also satisfied that the Board was aware of the appropriate standard to be applied and that the Board’s failure to adhere to that statutory standard was not a product of mere inadvertence that could be readily cured on remand. Its decision cited and quoted the statutory requirement, and the identical requirement in the DEP regulations, and then paraphrased that standard as follows: “[A] board of health must make specific findings concerning danger to the public health or safety or environment in the event that a board determines to not issue a site assignment after DEP issues a ‘positive’ site suitability report.” While it is more common for such boards to require applicants to prove that they meet certain requirements, and somewhat unusual to place the burden on a board to show that an application fails to meet the requirements, this Board was made aware of the specific albeit unusual burden it had to meet in order to deny this highly unpopular project.
Finally, the court is mindful of the fact that Wood Waste still faces significant, substantive review of the design, construction and operation of the facility, during which it will have to satisfy DEP that its pr oj ect meets all of the many health, safety and environmental engineering requirements for such a facility. Persons aggrieved by DEP’s later decisions on construction and operation permits will have rights to seek judicial review of those permitting decisions. G.L.c. Ill, §150A; G.L.c. 30A, §14. The Board’s site assignment is merely an interim step in a lengthy and detailed administrative process.[12] That step gives a local board an opportunity to stop a project if it finds that that use of the site would endanger the public, but a board’s missing that opportunity does not mean that the project is finally approved or that it is otherwise free from significant regulation. Where, as here, the Board has missed that opportunity, and where it appears unlikely that giving the Board another opportunity will enable it to build a better record in opposition to this project, it is not appropriate to further interrupt this protracted process to give the Board that second opportunity.
ORDER
For the foregoing reasons, plaintiffs motion for judgment on the pleadings is ALLOWED, defendant’s motion for judgment on the pleadings is DENIED, and it is hereby ORDERED (1) that judgment be entered in favor of plaintiff reversing the decision of the Board of Health of the City of Everett denying plaintiff its site assignment for the premises located at 141 Boston Street and (2) that the Board of Health of the City of Everett issue plaintiff its requested site assignment forthwith.

Wood Waste contends that its purchase of the noncompliant facility from the former owner was done pursuant to discussions with and assurances from both DEP and the City *434 of Everett. Those alleged discussions are not part of the present administrative record and have no bearing on this court’s review of the Board’s decision.

Wood Waste argues that this limitation on the ability of local boards to deny site assignment was to counter the “not in my back yard” attitude that had motivated local boards to reject such projects and thereby caused the “severe shortage” of solid waste disposal facilities cited by the Legislature in G.L.c. 21H, §l(a)(2). The Board argues that the court should ignore this suggestion in the absence of express legislative history. Whether or to what extent the Legislature was motivated by such concerns, the amendment of §150A did work a drastic change in the site assignment process, giving DEP the authority to determine whether a site met the criteria in §150Al/2 and requiring the local board of health to approve the site unless it made an affirmative finding that the facility would be a danger.

The environmental impact reports also pointed out that, as part of the upgrade of the site, a tenant trucking company would be leaving. The 18-wheel trucks from that company’s operations would no longer be traveling to and from the site, Where Wood Waste’s own operational volume would remain the same, the departure of the trucking company would yield a net decrease from current traffic volumes.

Under its discussion of whether the size of the facility was adequate, the Board also expressed concern that the size and layout of the facility would cause a “queue” of trucks to form on Boston Street. This issue will be addressed in the court’s assessment of the Board’s findings concerning the size of the facility (pp. 17-19, infra).

The Administrative Consent Order specifically required Wood Waste to submit a “comprehensive air pollution control plan that shall include a Best Available Control Technology (’BACT) analysis” as part of its later application for construction permit.

Under the Administrative Consent Order, some dust control measures were being put into place in advance of the construction of the building. The perimeter was fenced to a height of twenty feet with fine-woven mesh fabric screen to catch the dust and reduce wind on site. Fine spraying of the outdoor operations was also undertaken to keep dust down.

Wood Waste also confirmed that priority on the weigh scale would be given to incoming trucks. A departing truck that had already deposited its load and was needing to be weighed on the way out would not be put on the scale if there was an incoming truck needing to be weighed.

Nor was the consultant even aware of what the volume of traffic was on Boston Street that would be affected by any hypothetical “queue.”

“The proposed facility will not increase: the amount of traffic will not increase. The traffic that exists is there. The traffic does not have a problem getting onto the scale currently. The traffic does not have a problem turning onto the site. This is a current situation.” He further noted that the satisfactory situation with current traffic was the likely reason that DEP had not required Wood Waste to do a full scale traffic analysis.

The consultant also ignored the fact that DEP had already set volume and time limitations on storage of certain wastes at the facility as part of the Administrative Consent Order. The Administrative Consent Order imposed those limitations “pending approval or denial of [Wood Waste’s] final permits, approvals and site assignments.” While the precise limitations set forth in the Order do not necessarily remain in effect once those permits are granted, limitations appropriate to the enclosed operations, if any, could obviously be imposed as part of those later permits.

Wood Waste had taken samples from existing stockpiles and tested them for eight pollutant metals. No hazardous levels were found. The Board’s consultant criticized this submission because Wood Waste had not explained its “testing protocol,” had not tested for other compounds, and did not check for pollutants “which may have already leached into the ground.”

Meanwhile, under the Administrative Consent Decree, Wood Waste has continued its outdoor operations, and further delay in any upgrading and enclosing the facility does not serve the public interest.